JOE LAXAGUE, ESQ.
Nevada Bar No. 7417
JEFFREY D. PIKE, ESQ.
Nevada Bar No. 13934
Laxague Law, Inc.
1 East Liberty, Suite 600
Reno, NV 89501
Tel: (775) 234-5221
Facsimile (775) 996-3283
Email: joe@laxaguelaw.com

ROGER A. LANE, ESQ.
(will comply with LR IA 11-2 within 45 days)
Massachusetts BBO No. 551368
Foley & Lardner, LLP
111 Huntington Avenue
Boston, MA 02199-7610
Telephone:  617.342.4000
Facsimile:  617.342.4001
Email: RLane@foley.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **COMPARTMENT IT2, LP**, a Georgia limited partnership, **COMPARTMENT IT5, LP**, a Georgia limited partnership, **COMPARTMENT IT9, LP**, a Georgia limited partnership, and **MFAM MOBILFUNK ASSET MANAGEMENT GMBH**, a German corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**FIR TREE, INC. d/b/a FIR TREE PARTNERS**, a New York Corporation, **PAUL MCGINN**, an individual, **GABRIEL MARGENT**, an individual, **GRANT BARBER**, an individual, **JARRET COHEN**, an individual, and **SCOTT TROELLER**, an individual,<br><br>Defendants. | Case No.:  2:17-CV-1035<br><br><br>**COMPLAINT**<br><br><br>**JURY DEMAND** |

1    Plaintiffs, COMPARTMENT IT2, LP ("**IT2**"), COMPARTMENT IT5, LP ("**IT5**"),

2    COMPARTMENT IT9, LP ("**IT9**"), and MFAM MOBILFUNK ASSET MANAGEMENT

3    GMBH ("**MFAM**"), by and through their undersigned counsel, for their complaint against

4    Defendants, FIR TREE, INC. d/b/a FIR TREE PARTNERS ("**Fir Tree**"), PAUL MCGINN

5    ("**McGinn**"), GABRIEL MARGENT ("**Margent**"), GRANT BARBER ("**Barber**"), JARRET

6    COHEN ("**Cohen**"), and SCOTT TROELLER ("**Troeller**") (collectively, "Defendants"), allege

7    as follows:

8    **INTRODUCTION**

9    This action asserts claims for breach of fiduciary duty, and aiding and abetting breach of

10    fiduciary duty, against the former controlling stockholder of a Nevada company, CIG Wireless,

11    Inc. ("**CIGW**" or the "**Company**"), and CIGW's former Directors (the "**Director Defendants**"),

12    to recover damages on behalf of Plaintiffs, who were minority common stockholders of CIGW

13    and who have suffered the loss of the entire value of their equity interests as a result of the

14    Defendants' unlawful course of conduct, which culminated in a merger the Defendants

15    engineered to deliver a 200% return to CIGW's former controlling stockholder, while destroying

16    the value of Plaintiffs' equity interests in CIGW for no consideration.

17    CIGW's former controlling stockholder, Fir Tree (as defined below), owed fiduciary

18    duties to CIGW's minority stockholders, including Plaintiffs, which it repeatedly and

19    consistently breached by abusing its control position to serve its own interests; coopting the

20    Director Defendants in service of Fir Tree's objectives; and engaging in massive self-dealing to

21    the direct detriment of Plaintiffs. The Director Defendants, for their part, did not act with loyalty

22    or in good faith in their management of the Company's business and affairs; instead, the Director

23    Defendants abdicated their affirmative duty to manage the business and affairs of the corporation

24    for the benefit of CIGW and all of its stockholders, and in so doing engaged in intentional

25    misconduct as corporate directors. Disabled by conflicts of interest and the domination and

26    control of Fir Tree, the Director Defendants served the interests of Fir Tree and their own

27    personal interests, while knowingly destroying the value of Plaintiffs' equity interests in CIGW

28    in the process.

## THE PARTIES

### The Plaintiffs

1.      Plaintiff IT2 is a Georgia limited partnership with headquarters in Potsdamer Platz 1, 10785 Berlin, Germany, holding 25,289,853 shares of CIGW common stock.

2.      Plaintiff IT5 is a Georgia limited partnership with headquarters in Potsdamer Platz 1, 10785 Berlin, Germany, holding 14,200,567 shares of CIGW common stock.

3.      Plaintiff IT9 is a Georgia limited partnership with headquarters in Potsdamer Platz 1, 10785 Berlin, Germany, holding 6,841,008 shares of CIGW common stock.

4.      IT2, IT5 and IT9 are referred to collectively as the "IT Funds."

5.      Plaintiff MFAM is a German corporation with headquarters in Potsdamer Platz 1, 10785 Berlin, Germany, directly or beneficially holding 11,428,600 shares of CIGW common stock.

### The Defendants

6.      Defendant Fir Tree, Inc. d/b/a Fir Tree Partners ("Fir Tree") is a New York corporation with its principal place of business in New York City, New York.  Fir Tree is a privately-owned hedge fund sponsor.  As such, Fir Tree sponsored and is the Manager for two investment vehicles that held preferred shares in CIGW:  (i) Fir Tree Capital Opportunity Master Fund, L.P. ("Fir Tree Capital"), which came to own 257,908 shares of Series A-1 Preferred Stock of CIGW and 61,049,054 shares of Series A-2 Convertible Preferred Stock of CIGW and (ii) Fir Tree REF III Tower LLC ("Fir Tree REF"), which also came to own 257,908 shares of Series A-1 Preferred Stock of CIGW and  61,049,054 shares of Series A-2 Convertible Preferred Stock of CIGW.

7.      As Manager of Fir Tree Capital and Fir Tree REF, Fir Tree had the authority to cause each of Fir Tree Capital and Fir Tree REF to purchase and sell securities issued by CIGW and to exercise any and all voting and other rights associated with such securities.  As a result, as Fir Tree reported in its filings with the United States Securities and Exchange Commission (the "SEC"), Fir Tree controlled the 122,098,108 shares of Series A-2 Convertible Preferred Stock of

CIGW that were owned by Fir Tree Capital and Fir Tree REF. Those 122,098,108 shares of Series A-2 Convertible Preferred Stock of CIGW constituted a controlling 63.5% of all of the issued and outstanding voting stock of CIGW. Fir Tree was therefore the controlling stockholder of CIGW, and as such, Fir Tree owed fiduciary duties to CIGW's minority stockholders, including Plaintiffs.

8.    Pursuant to restricted stock award agreements between CIGW and certain officers, directors and employees of CIGW (collectively, the "**Restricted Stockholders**") governing a total of 8,014,876 shares of issued and outstanding CIGW restricted common stock (discussed further below), Fir Tree obtained the right to act as the proxy and attorney-in-fact for the Restricted Stockholders. As such, Fir Tree has the authority to vote all of their respective shares of restricted stock on all matters to which the Restricted Stockholders are entitled to vote. As a consequence, Fir Tree controlled the votes of a total of 130,112,984 shares of CIGW stock, representing approximately 65%, or nearly a supermajority, of all issued and outstanding CIGW voting stock.

9.    Upon information and belief, Defendant Troeller is an individual residing in Montclair, New Jersey. He is and was at all times relevant to the claims asserted in this lawsuit a member of the CIGW Board of Directors (the "Board"). Troeller is and was also a member of the Board's Compensation Committee at all times relevant to this lawsuit, and a Managing Director of Fir Tree, the controlling stockholder of the Company. As an executive at Fir Tree, Troeller depended upon Fir Tree for his livelihood and, on information and belief, Troller also had a material personal financial interest, via so-called "carried interest," in the financial performance of Fir Tree and its investment vehicles.

10.    Upon information and belief, Defendant Cohen is an individual residing in New York, New York. He is and was at all times relevant to the claims asserted in this lawsuit a member of the Board. Cohen is and was also a member of the Audit Committee at all times relevant to this lawsuit, and the Head of Private Real Estate at Fir Tree, the controlling stockholder of the Company. As an executive at Fir Tree, Cohen depended upon Fir Tree for his livelihood and, on information and belief, Cohen also had a material personal financial interest,

via so-called "carried interest," in the financial performance of Fir Tree and its investment vehicles.

11.    Upon information and belief, Defendant McGinn is an individual residing in Lake Worth, Florida.  He is and was at all times relevant to the claims asserted in this lawsuit both Chief Executive Officer of the Company and a member of the Board.  As compensation for his employment in 2013 and 2014, McGinn earned $300,000 in salary and $150,000 bonus, for a total $450,000 in total compensation per year.  On information and belief, McGinn was not a person of independent means and he depended upon his employment at CIGW for his livelihood. It was McGinn's pre-existing relationship with Vertical Bridge Holdings, LLC ("Vertical Bridge") that led to negotiations to sell the Company.  As of January 2, 2015, McGinn owned 50,000 shares of CIGW Common Stock and 6,367,890 shares of Restricted Stock.

12.    Upon information and belief, Defendant Margent is an individual residing in South Orange, New Jersey.  He is and was at all times relevant to the claims asserted in this lawsuit a member of the Board.  Margent was also a member of the Board's Compensation Committee at all times relevant this lawsuit, and served on the Special Committee formed in late 2014 to consider the merger with Vertical.  As of April 1, 2015, Margent owned approximately 189,537 shares of Restricted Stock.

13.    Upon information and belief, Defendant Barber is an individual residing in Potomac, Maryland.  He is and was at all times relevant to the claims asserted in this lawsuit a member of the Board.  Barber was also a member of the Board's Compensation Committee at all times relevant to this lawsuit, and served on the Special Committee formed in late 2014 to consider the merger with Vertical.  As of April 1, 2015, Barber owned approximately 189,537 shares of Restricted Stock.

14.    Troeller, Cohen, McGinn, Margent and Barber are referred to collectively as the "Director Defendants."

## JURISDICTION AND VENUE

15.    This is an action under Nevada law for breaches of fiduciaries duties and for aiding and abetting such breaches.  This Court has jurisdiction over this action pursuant to 28

U.S.C. § 1332(a)(2) & (3), in that this is an action for damages in excess of $75,000.00, exclusive of interest and costs, and there is complete diversity between the parties, as the Plaintiffs are citizens of the State of Georgia and Germany, and the Defendants are citizens of the States of New York, New Jersey, Florida and Maryland, as alleged herein.  The Court has personal jurisdiction over the Director Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A), because each Director Defendant is a former director of CIGW, a Nevada corporation, and each Director Defendant is therefore deemed to have consented to personal jurisdiction in Nevada as a "management person" of CIGW pursuant to N.R.S. §75.160(1) & (10)(c).  In addition, all Defendants, including the Director Defendants and Fir Tree, have stipulated to personal jurisdiction in Nevada over all claims in this action.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3), in that all Defendants are subject to and/or have stipulated to personal jurisdiction in Nevada, and there is no district in which this action may otherwise be brought, because CIGW adopted a forum selection bylaw requiring that actions asserting a breach of fiduciary duty against CIGW's officers and directors be brought in Nevada.  In addition, venue is proper in this Court because, in order to resolve a prior dispute in Florida regarding the validity of CIGW's forum selection bylaw, the Defendants stipulated to jurisdiction in Nevada without limiting their assent to any particular federal or state court in Nevada.

## FACTUAL ALLEGATIONS

17.    CIGW was a developer, operator, and owner of wireless and broadcast communication towers in the United States.  The Company's business consisted primarily of leasing antenna space on its network of communication sites to wireless service providers. CIGW generated its revenues through monthly or annual rental payments from wireless service providers, typically pursuant to long-term contracts with fixed escalation rates.

18.    At all times relevant to the claims asserted in this lawsuit CIGW maintained its corporate headquarters at 11120 South Crown Way, Suite 1, Wellington, Florida 33414.

19.    CIGW was formed through a merger in late 2011.  As of December 2011, CIGW owned 42 wireless communications towers valued at approximately $16 million, with a stated

goal of increasing revenues and accomplishing significant growth in the number of towers it owns and operates, through both acquisitions and new development.

20.     Until its delisting on or about May 15, 2015, CIGW's Common Stock (symbol: CIGW.OB) was listed on the Over the Counter Bulletin Board.  As of January 31, 2012, the Company had issued 19,766,610 shares of Common Stock, which then traded at approximately $3 a share, for a total market capitalization of nearly $60 million.

21.     In the first two years following the 2011 merger, CIGW executed on its plan to increase revenues and grow its network of communications towers.  By the end of the third quarter of 2013, the Company had more than tripled its tower holdings, to 140 towers throughout the United States, which were valued at over $50 million, and the Company controlled numerous work-in-progress sites throughout the country.  Its market capitalization expanded with the expansion of its assets and revenues.

**The InfraTrust Investments**

22.     CIGW accomplished its significant growth through a series of restructurings, acquisitions, and project developments, financed in large part by outside investors.

23.     One such group of investors was comprised of three investment funds based in Germany, the IT Funds.  The IT Funds had long partnered with CIGW and its corporate predecessor through a series of agreements by which the IT Funds made loans to a CIGW subsidiary to finance the acquisition of tower assets, in return for priority over the tower profits and interest as creditors.  In mid-2012, encouraged by the positive growth of the Company, the IT Funds negotiated with the Company to relinquish, over time, their advantageous position as creditors, in return for an equity position in the Company.

24.     On June 30, 2012, the IT Funds and CIGW formally entered into an agreement to restructure the IT Funds' loans as investments in the Company (the "**IT Investment**"), such that the debt owed by the Company to the IT Funds was eliminated, and in return, the interests of IT2 and IT5 would, by no later than December 31, 2014, convert into shares of CIGW common stock, and the interests of IT9 would so convert by no later than March 31, 2015.

25.    The IT Funds' decision to engage in the restructuring was based on their reliance on two fundamental premises, each of which CIGW acknowledged:   first, that CIGW would continue its commitment to an expansive growth strategy; and second, that CIGW would undertake to register its common stock on a U.S. national exchange.   Specifically, the IT Funds understood that the Company would continue its publicly-stated plans to make significant investments in its business and marketing operations so as to develop its network, expand its markets, construct new towers and acquire existing towers, and thereby increase the value of CIGW and its stock, which would be registered and trade on a U.S. national exchange.

26.    Leading up to the IT Investment, CIGW's stock had remained steady at around $3.  Following the IT Investment, the stock immediately climbed to $3.70, and then proceeded to move into the $4 to $5 range for the next year.

27.    On information and belief, as part of the effort to raise CIGW's profile in the equity markets and support the listing of CIGW's stock on a U.S. national exchange, First Berlin Equity Research ("First Berlin") was engaged to commence coverage of CIGW.  On September 20, 2012, First Berlin initiated its coverage with a "buy" rating and a price target of $5.60.   In making its purchase recommendation, First Berlin noted, among other things, that CIGW would soon be the only publicly-traded medium-sized wireless communications tower company; that it had the support of a new $150 million multi-draw credit facility from Macquarie Bank Limited ("Macquarie"); and that CIGW had significant growth potential through portfolio acquisitions and business development activities.

**The Fir Tree Financing**

28.    To support and finance its acquisition and growth strategy, at the beginning of August 2013, CIGW entered into a preferred stock financing arrangement with Fir Tree (the "**Fir Tree Financing**").  In exchange for $35 million in financing, the Company granted Fir Tree 349,707 shares of newly-created CIGW Series A-1 Preferred Stock and 29,297,652 shares of newly-created CIGW Series A-2 Convertible Preferred Stock.

29.    Under the exclusive terms of the Fir Tree Financing, following Fir Tree's initial investment, the Company was entitled to call additional financing of up to $25 million from Fir

Tree (the "**Fir Tree Facility**") to make acquisitions, and in return Fir Tree would receive a certain number of shares of CIGW Series A-1 Preferred Stock and Series A-2 Convertible Preferred Stock, based on the then-current trading price of CIGW's common stock.

30.    The Series A-1 Preferred Stock provided no voting rights.  However, the stock paid a dividend, set at 9% in the first three years, and it carried a substantial liquidation preference that gave the Series A-1 Preferred Stock first priority in the event of a liquidation. The liquidation preference was comprised of the entire "stated value" of the Series A-1 Preferred Stock, all accrued but unpaid dividends, and an additional premium—but that premium would only be available if Fir Tree, and hence CIGW, succeeded in realizing a liquidation event within three years.

31.    Each share of Series A-2 Convertible Preferred Stock came with voting rights equal to those of the Company's common stock.  The Series A-2 Convertible Preferred Stock, while subordinate to the Series A-1 Preferred Stock, had priority over all other issued shares in the context of a liquidation event, and it carried an even more substantial liquidation preference, which by its terms could equal or exceed the entire fair market value of the Company.

32.    Moreover, the arrangement provided Fir Tree's Series A-1 and A-2 Preferred Shares with anti-dilution protection—unusual for the stock of a publicly-traded company.  Upon the occurrence of certain events, including new issuances of common stock, Fir Tree would automatically and at no cost be granted additional shares of Series A-2 Convertible Preferred Stock that would maintain their voting power and the magnitude of their liquidation preference.

33.    Finally, Fir Tree obtained the sole right to designate two members of CIGW's five-member Board of Directors.

34.    At the closing of the Fir Tree Financing, on August 1, 2013, Fir Tree designated Defendants Troeller and Cohen, both Fir Tree executives, to seats on the CIGW Board.

35.    Immediately following the closing of the Fir Tree Financing on August 2, 2013, the Company had 30,701,123 shares of Common Stock issued and outstanding, and 29,297,652 shares of the Series A-2 Convertible Preferred Stock issued and outstanding.  As a result, at that time, Fir Tree controlled approximately 48.8% of CIGW's issued and outstanding shares.

36.    On August 2, 2013, the Company used proceeds from the Fir Tree Financing to close wireless communications tower purchases, including certain cell tower assets of Liberty Towers, LLC, which had been agreed upon in May, and the acquisition of 28 additional towers from Southern Tower Antenna Rental, LLC.   Completion of these transactions increased the Company's portfolio of assets to 139 revenue-generating towers.   One additional tower was acquired on September 30, 2013, to bring the total as of that date to 140.

**Fir Tree Becomes CIGW's Controlling Shareholder**

37.    By virtue of its near-majority voting power as of August 2, 2013, its director-designation power, its anti-dilution protection, and a series of restrictive covenants that specifically required Fir Tree's approval before CIGW could take any action, Fir Tree, as a stockholder, exercised actual domination and control over CIGW, its Board, and its management.

38.    Fir Tree's restrictive covenants included the following:

a.    A prohibition on CIGW's Board adopting any amendments to its By-Laws without Fir Tree's permission;

b.    A prohibition on CIGW making any new acquisitions—such as cell towers or sites—without Fir Tree's permission;

c.    A prohibition on CIGW approving or altering its annual budget without Fir Tree's permission;

d.    A prohibition on CIGW approving or altering its business plan without Fir Tree's permission;

e.    A prohibition on CIGW making any material expenditure without Fir Tree's permission;

f.    A prohibition on CIGW incurring, assuming or increasing any indebtedness without Fir Tree's permission;

g.    A prohibition on CIGW creating, assuming or allowing any lien, charge, or encumbrance to arise with respect to any of CIGW's existing assets without Fir Tree's permission;

       h.     A prohibition on CIGW making any dividends or distributions related to its stock to any shareholder—except Fir Tree—without Fir Tree's permission; and

       i.     A prohibition on CIGW hiring, firing, or increasing the compensation of management without Fir Tree's permission.

39.     Thus, as of August 2, 2013, Fir Tree had established itself as the actual controlling shareholder of CIGW and, as such, Fir Tree owed a fiduciary duty to CIGW's non-controlling, minority stockholders, including Plaintiffs.

**Fir Tree Puts CIGW in "Sleep Mode" and Starts "Equity Tunneling"**

40.     Now firmly under the direction and control of Fir Tree, the Company proceeded to suspend nearly all new growth and expansion activities, as well as support for the Company's public profile and its stock, to the direct and substantial detriment of CIGW's minority stockholders.

41.     In September 2013, just one month after the Fir Tree Financing, CIGW's acquisition machine slowed to a crawl. During the 19-month period from September 2013 to March 2015, despite having millions of dollars of new financing at its disposal, the Company significantly curtailed its growth. To the extent that CIGW did acquire additional towers, it did so in large part through amendments to transactions that had been negotiated and closed *prior to* the Fir Tree Financing. In stark contrast to the previous 19-month period, in which CIGW had increased its communication tower assets by over 300%, CIGW's growth rate shrunk to a small fraction of that figure.

42.     Moreover, following the Fir Tree Financing, the Company only twice called upon the Fir Tree Facility to finance additional acquisitions, for a total of $9 million in financing, despite the availability of $25 million.

43.     Following the first of these financings, on December 18, 2013, Fir Tree received an additional 60,000 shares of the Series A-1 Preferred Stock and 5,139,192 shares of the Series A-2 Convertible Preferred Stock. This transaction increased Fir Tree's holdings to 34,881,338 shares, giving Fir Tree a 53.2% stake in the Company and causing Fir Tree to become CIGW's outright majority shareholder, which it remained through the closing of the merger with Vertical

Bridge in May 2015.  By December 18, 2013, the value of CIGW's common stock had already dropped by nearly half, to approximately $1.50 per share.

44.     Following the second of these financings, on March 7, 2014, Fir Tree received an additional 30,000 shares of Series A-1 Preferred Stock and 3,230,442 shares of Series A-2 Convertible Preferred Stock.  This transaction increased Fir Tree's holdings to over 39 million shares, or approximately 56% of the outstanding voting stock of CIGW, further solidifying Fir Tree's grip on the Company.  By March 7, 2014, the common stock had dropped even further, to approximately $1.25 per share.

45.     Each of these transactions significantly diluted CIGW's common stock and placed it under an exponentially-increasing Fir Tree liquidation preference, which was reflected in the plummeting share price.

46.     At the same time, CIGW suspended all public support for the Company and its stock.  Instead of regularly issuing press releases to announce new asset acquisitions, investor communication initiatives, industry conference appearances, corporate finance developments, and the like, as CIGW had done in 2012 and up to the time of the Fir Tree Financing in 2013, CIGW issued only four press releases between September 2013 and March 2015—three to deliver quarterly reports, and the fourth to announce the proposed acquisition of CIGW by Vertical Bridge in March 2015—which would prove to be the end of CIGW's separate corporate existence.  The Company had no visible public relations or investor relations activity, and for nineteen months it had failed to issue a single press release touting its achievements, developments, acquisitions, objectives or future plans.  In fact, with Fir Tree holding veto power over CIGW's business plan, budget and expenditures, CIGW did not even have an approved budget in Fiscal Years 2014 and 2015 for such activity.

47.     Following the closing of the Fir Tree Financing, CIGW's Board abdicated its affirmative duty to manage the business and affairs of the corporation for the benefit of CIGW and all of its stockholders, and instead, under the domination and control of Fir Tree, the Board consistently enabled Fir Tree's objective of eroding the value of CIGW's common stock in order to render Fir Tree the outright majority stockholder of CIGW and shift the entire value of

CIGW's equity to Fir Tree, leaving the minority stockholders with nothing.  Fir Tree co-opted CIGW's Board to enable the terms of the Fir Tree Financing to operate in the most toxic way possible for CIGW and its stockholders at large.  This tactic of manipulating a company's affairs to shift control and equity value to a self-interested, dominant stockholder is sufficiently well-known to be recognized in the field of economics and in recent case law as "equity tunneling."  It has no social value, and it is wrongful.

48.     Under the domination and control of Fir Tree, the Director Defendants also did not list the CIGW common stock on a U.S. national exchange and, in fact, abandoned all efforts to do so, contrary to their assurances to the IT Funds.

49.     Since Fir Tree invested in CIGW in August 2013, the Company's common stock went into continual free fall, a consequence of massive Fir Tree dilution, the mushrooming Fir Tree liquidation preference, and the intentional lack of support on the part of both Fir Tree and CIGW's Board for the Company's public profile and its common stock.

50.     Between August 2013 and December 2014, the common stock lost approximately 91% of its value, falling from $2.99 per share on August 1, 2013, to $0.28 per share on December 31, 2014.  The common stock further plunged following announcement of the proposed Merger (discussed below), and became all but worthless at approximately $0.02 per share, reflecting a 99% drop in value.  The value of CIGW as a company remained, but all of its equity value had been "tunneled" to Fir Tree.

51.     On information and belief, in or about June 2014, First Berlin Equity Research produced a draft update of its coverage of CIGW's stock.  On information and belief, First Berlin sent its draft update to CIGW for review, but because CIGW – now firmly under Fir Tree's control – never responded to First Berlin, the update never saw the light of day, and neither CIGW nor Fir Tree made any further effort to carry through on CIGW's promise to the IT funds to undertake to register CIGW's common stock on a U.S. national exchange.

52.     In its draft update, First Berlin observed, among other things, that the implementation of the Fir Tree Financing, the anti-dilution provisions secured by both Fir Tree and CIGW's insiders for their own personal benefit (as further described below), and Fir Tree's

already controlling 61% stake, rendered it difficult for CIGW to access any further equity financing in the capital markets, and created a risk of unexpectedly severe dilution of CIGW's existing shareholders if CIGW did obtain such financing. First Berlin further noted that the net loss attributable to CIGW's common stockholders – including the Plaintiffs here – had ballooned to nearly $22 million in the first fiscal quarter of 2014, the vast majority of which was due to the toxic implementation of the Fir Tree Financing. First Berlin projected that by the end of fiscal 2014, the value of CIGW's common stock would be a *negative* $11 million. At that point, unbeknownst to CIGW's common stockholders and the public markets, Fir Tree and the CIGW Board had abandoned all effort to support CIGW's common stock in the public markets, and with it, they abandoned the promise to undertake to register CIGW's common stock on a U.S. national exchange.

53. Despite the toxic effect of Fir Tree's overreaching and the self-dealing of CIGW's officers and directors (as further described below), First Berlin nonetheless continued to see significant value in CIGW's core communications tower business – as, no doubt, did Fir Tree. First Berlin projected growth in CIGW's tower portfolio and related cash flows, and further projected the liquidation value of CIGW's tower portfolio to be $248 million. Consequently, Fir Tree continued to "tunnel" the value of CIGW's equity to itself, and to further tie CIGW's insiders to the service of Fir Tree's interests, while failing to inform CIGW's common stockholders, and the public markets at large, that Fir Tree intended to – and would – misappropriate the entire equity value of CIGW to themselves.

**Introduction of a Restricted Stock Plan**

54. As the value of the stock held by CIGW's minority stockholders continued to erode, CIGW's insiders saw an opportunity, which Fir Tree actively participated in approving, to reward themselves with a new equity incentive plan (the "**EIP**") for the benefit of CIGW's management and non-employee directors.

55. In January 2014, the Compensation Committee consisted of three members: Defendant Troeller of Fir Tree, and two non-employee directors, Defendants Margent and Barber.

56.    On January 29, 2014, the Compensation Committee approved the EIP and proceeded to approve grants of approximately 7,000,000 restricted shares.  While the Company's CEO (Defendant McGinn) and CFO received the two largest grants, the next two largest grants were made to the supposedly "independent" non-employee members of the Compensation Committee, Defendants Margent and Barber.  Thus, in establishing the EIP and then making grants to themselves, Defendants Margent and Barber engaged in blatant self-dealing.

57.    Without any authorization by CIGW's stockholders in the corporate charter for a separate series or class of common stock with special rights or preferences, the Restricted Stock issued under the EIP was also given anti-dilution protection.  Each time that Fir Tree received new shares of preferred stock, the EIP recipients would be granted additional restricted stock, so that their percentage ownership in CIGW remained unaffected by additional, dilutive issuances to Fir Tree.  No such protection was provided to any other holders of common stock, including Plaintiffs.

58.    The Compensation Committee then approved initial grants of 7,080,255 shares of restricted stock under the EIP, each of which was subsequently augmented by operation of the anti-dilution protection in the EIP, including:

    a.    An initial award of 5,561,866 shares on February 27, 2014, to Director and CEO McGinn, then valued at approximately $9.4 million;

    b.    An initial award of 166,856 shares on February 27, 2014, to Director and Compensation Committee member Barber, then valued at approximately $280,000;

    c.    An initial award of 166,856 shares on February 27, 2014, to Director and Compensation Committee member Margent, then valued at approximately $280,000;

    d.    An initial award of 556,187 shares on February 27, 2014, to Chief Financial Officer and Treasurer Romain Gay-Crosier, then valued at approximately $930,000.

59.    In addition to engaging in blatant self-dealing by granting themselves shares of Restricted Stock, the members of the Compensation Committee also conditioned the vesting of the EIP shares on achieving liquidity for the investment of CIGW's controlling stockholder, Fir

Tree, and Fir Tree alone—achieving liquidity for the common stock held by CIGW's minority shareholders was not required by the terms of the EIP, and CIGW's minority shareholders could be left holding an empty bag.

60.    By conditioning the vesting of restricted shares on achieving liquidity for Fir Tree alone, and accepting substantial share grants that were so conditioned, Directors McGinn, Barber, and Margent aligned their personal financial interests with Fir Tree's interest in achieving liquidity, and thereby placed themselves in a material, ongoing conflict of interest: they would have to pursue a sale of CIGW in the near-term, rather than seeking to grow the Company's value over time, if their restricted shares were to vest and have the potential of delivering any value to them.  In so doing, Directors McGinn, Barber, and Margent abdicated their core fiduciary duty to seek to maximize the value of CIGW for the benefit of all its stockholders over the long term, as well as any independence they might otherwise have claimed to have had from Fir Tree.  Instead, they became beholden to Fir Tree and squarely aligned with its interests—to the detriment of CIGW itself and its minority shareholders.

61.    Additionally, each publicly-disclosed recipient of the plan, including directors McGinn, Barber, and Margent, took the unusual step of abdicating all voting rights with respect to these shares, and instead Fir Tree secured the authority to act as their proxy and attorney-in-fact to vote all of the approximately 7 million shares of Restricted Stock issued under the EIP.  Thus, not only were the recipients tied to Fir Tree in terms of vesting, but in fact Fir Tree possessed all the recipients' voting power, as well.

**Self-Dealing and Equity Tunneling Cement Fir Tree's Position**

62.    Without providing any further financing to CIGW, Fir Tree also obtained multiple, additional grants of Series A-1 Preferred Stock and Series A-2 Convertible Preferred Stock, solidifying its control over CIGW, depriving the minority stockholders of even more of the value of their equity, and shifting the entire value of the Company and its stock to Fir Tree.

63.    During the period from December 18, 2013 through January 2, 2015, in at least nine successive grants, Fir Tree obtained over 44,000 additional shares of Series A-1 Preferred Stock and over 7.2 million shares of Series A-2 Convertible Preferred Stock.  Each of these

successive grants made by the Fir Tree-dominated Board, primarily in lieu of simple cash dividends, further diluted the common stock, expanded the overhang of Fir Tree's liquidation preference, and further eroded the common stock share price.

64.    On December 31, 2014, the interests of IT2 and IT5 in their loans to the Company automatically converted to common stock, pursuant to their 2012 (pre-Fir Tree) agreement. Based on the terms of the 2012 agreement, IT2 and IT5 stood to receive 39,490,420 shares of common stock, which would have had given the IT Funds a one-third stake in the Company, and also would have had the effect of returning Fir Tree to the position of a minority shareholder.  In addition, on March 31, 2015, the interest of IT9 in its loans to the Company converted to common stock, pursuant to its 2012 agreement.  Based on the terms of the 2012 agreement, IT9 received 6,841,008 shares of common stock, which should have further enhanced the IT Funds' stake in the Company.

65.    Although Fir Tree stood to receive a massive number of off-setting Series A-2 Convertible Preferred shares under the anti-dilution provisions of the Fir Tree Financing, CIGW did not have a sufficient number of such Series A-2 shares authorized by its stockholders to issue to Fir Tree after the conversion of all of the IT2, IT5 and IT9 interests, nor were a sufficient number of common shares authorized for those Series A-2 shares to potentially convert into.  But with its control position, and as a harbinger of things to come, Fir Tree readily solved that problem for itself, by unilaterally amending CIGW's charter and certificate of designation, without the consent of, or even prior notice to, any of CIGW's minority stockholders, to increase the authorized common shares by 200,000,000; increase the authorized preferred shares by 105,000,000; and increase the authorized Series A-2 Preferred Shares by 105,000,000.  By itself, this brazen Fir Tree action tripled CIGW's authorized common shares, and more than doubled the authorized preferred and, specifically, the Series A-2 Preferred Shares, which are held by Fir Tree alone.  As a result of this massive, self-dealing share increase, Fir Tree enabled itself to obtain, at no cost, an additional 42.9 million shares of Series A-2 Convertible Preferred Stock, which, despite the greatly eroded share value, was worth $12 million on the open market, and Fir Tree stood to receive its outsized Series A-2 liquidation preference before the common shares

1    which had just been issued to the IT Funds received anything.  Fir Tree thereby preserved its

2    majority control, while the common stock issued to the IT Funds, together with all of the

3    previously-outstanding CIGW common stock, was immediately decimated in value.

4         66.    In all, the fair value of these successive, no-cost grants received by Fir Tree was

5    estimated by the Company at $20 million, and Fir Tree came to control over 60% of the CIGW

6    stockholder vote in the process.

7    **The Proposed Merger**

8         67.    On March 20, 2015, CIGW shocked its minority stockholders and the market by

9    announcing its entry into a merger agreement (the "**Merger**" or "**Merger Agreement**") with

10   Vertical Bridge, which Fir Tree as controlling stockholder had already approved.  Under the

11   terms of the Merger, Fir Tree would receive approximately $90 million in cash, which would pay

12   off all of Fir Tree's loans to CIGW with interest and provide a 200% return on Fir Tree's equity

13   investment in CIGW.  Meanwhile, the entire pool of tens of millions of common and Series B

14   shares, once worth approximately $80 to $100 million, would be eligible to split a token payment

15   of $1.75 million—but only if they agreed to release Fir Tree and the Director Defendants from

16   liability.    In other words, the Board had structured the deal, and Fir Tree as controlling

17   stockholder had already voted it through, such that while Fir Tree would double its equity

18   investment—its intention from the start—the minority shareholders would receive mere pennies

19   on the dollar, and only if they unconditionally released their claims.  In short, Fir Tree and the

20   Director Defendants had sacrificed any effort to build CIGW's value and realize it for the benefit

21   of all stockholders, and resolved instead to enter into a sale of CIGW to realize Fir Tree's goal of

22   obtaining near-term liquidity for itself, with a 200% return, in cash.

23        68.    On April 6, 2015, CIGW filed a preliminary information statement regarding the

24   Merger with the SEC.  In that information statement, CIGW disclosed that for more than 13

25   months, since February 2014, CIGW had been engaged in active discussion and negotiations to

26   sell the Company to Vertical Bridge, and Vertical Bridge alone.

27        69.    In February 2014, director and CEO McGinn was reportedly contacted by a

28   longtime acquaintance, Marc Ganzi, the CEO of Digital Bridge Holdings LLC ("**Digital**

- 18 -

**Bridge**"), an affiliate of Vertical Bridge.  At a meeting on February 19, 2014, Mr. Ganzi expressed to Defendant McGinn an interest in potentially merging with or acquiring the Company.  In little more than a week, Defendant Troeller of Fir Tree, with Defendant McGinn in tow, was meeting with Mr. Ganzi at Mr. Ganzi's office to pursue the issue.

70.    The merger discussions quickly evolved into due diligence and active merger negotiations, guided by the Fir Tree-dominated Board.  By November 2014, some seven months into the process, the Board had approved a memorandum of understanding establishing the central terms of the Merger, and the Board had agreed that CIGW would negotiate exclusively with Vertical Bridge.  Having set the course for the Merger and the termination of CIGW's separate corporate existence, the Fir Tree-dominated Board then sought to "window-dress" the proceedings, appointing an ornamental Special Committee to oversee further negotiations.  The Special Committee consisted of directors Barber and Margent, each of whom had long ceased to be independent and disinterested, having instead aligned their interests with finding an acceptable liquidity event for Fir Tree.  Moreover, the Board only authorized the Special Committee to evaluate Vertical Bridge's proposed transaction.  Critically, the Special Committee was not authorized to solicit, consider, or negotiate any alternate proposals that might be available to CIGW while negotiations with Vertical Bridge were ongoing.  The Special Committee process, in short, was a sham.

71.    Directors Margent and Barber accepted their new duties as members of the Special Committee, despite the fact that the Board had already approved the memorandum of understanding establishing the central terms of the Merger, and despite the fact that, with the grants of Restricted Stock they had made to themselves under the EIP, they had long ago ceased to function as true "independent" directors on the Board.

72.    By the time the Special Committee was established, the ongoing deterioration in CIGW's stock price had reduced the value of Margent and Barber's restricted shares – which they had granted to themselves – to approximately $90,000.  While that potential $90,000 gratuitous "bonus" was in and of itself sufficient to compromise the disinterestedness and independence of outside directors like Margent and Barber, Fir Tree and the Board that it

dominated sought to enhance the incentives of Margent and Barber and ensure that they would continue to participate in this sham process. To that end, they approved additional payments of $10,000 per month *each* to Margent and Barber. These monthly payments were *four times greater* than the customary stipends of $2,500 per month that Margent and Barber received for their regular service as CIGW directors. Between the formation of the Special Committee and the date the Merger closed, Margent and Barber each received an additional $70,000 in cash, and total payments of $87,500, where each would have otherwise received only $17,500 during that time period.

73.    In the midst of the Special Committee's work, a few additional tower assets became available for CIGW's purchase. By that time, the Fir Tree Facility had expired, and yet Fir Tree retained a preclusive right of first refusal over any future financing of CIGW. With merger negotiations well underway, Fir Tree knew that if it extended any further equity financing to CIGW, Fir Tree would effectively receive nothing for such an investment in the Merger. Instead, knowing that its action would further submerge the common stock under Fir Tree's dominant economic position in CIGW, Fir Tree offered $7 million of secured, high-interest debt, which was payable to Fir Tree even before the Fir Tree liquidation preference was paid and, more to the point, before CIGW's minority stockholders received anything in respect of their shares. The Fir Tree-dominated Board immediately accepted Fir Tree's terms.

74.    On February 6, 2015, the Company received an unsolicited bid for the acquisition of CIGW from an undisclosed strategic buyer (identified by the Company as "**Industry Participant 1**"). Industry Participant 1's offer was for approximately $98 million—nearly the same price initially offered by Vertical Bridge. Rather than deferring to the Special Committee to evaluate the competing offer, the Fir Tree-dominated Board circumvented the Special Committee and considered the matter itself. The Special Committee, for its part, acquiesced in its lack of any real authority, taking no action to neutralize Fir Tree's influence or play any role in the evaluation or negotiation of competing bids. Despite the fact that the bid was nearly identical to Vertical Bridge's initial bid, which the Board had eagerly embraced and pursued, the

Board peremptorily turned down Industry Participant 1's bid, with no offer to discuss or negotiate further.

75.    On March 9, 2015, the Company received a second unsolicited bid for the acquisition of CIGW from a second, undisclosed strategic buyer (identified by the Company as "**Industry Participant 2**").  Industry Participant 2's opening expression of interest covered a range that exceeded Vertical Bridge's initial indication of interest.  Yet again, the Board circumvented the Special Committee and peremptorily turned down the bid, with no offer to discuss or negotiate further.  And once again, the Special Committee acquiesced, taking no action to assert itself on behalf of the minority shareholders whose interests it was purportedly created to protect.

76.    When Fir Tree made its investment in CIGW in August 2013, the CIGW Series B Preferred Stock and Common Stock were collectively valued at between $80 to $100 million—in essence, what Fir Tree itself ultimately reaped from the Merger.  Under the final terms of the Merger, however, the CIGW Series B Preferred Stock and Common Stock would receive *nothing*—unless they released their claims against Fir Tree and the CIGW Board, and even if they did that, only $1.75 million was set aside for them to share.  That sum was roughly two cents on the dollar relative to the August 2013 value of their stock, when Fir Tree entered the picture, and it represented the same amount that they could get by selling their shares in the public market after the Merger had been announced, without giving Fir Tree and the CIGW Board the windfall of a release from their liabilities.  In short, Fir Tree manipulated CIGW in service of Fir Tree's own interests to take all of CIGW's equity value for itself.

77.    Worse yet, the Merger was a "sweetheart deal" for McGinn's friend Marc Ganzi and his company, Vertical Bridge.  With a transaction value of approximately $90 million, Vertical Bridge scarcely paid for CIGW's existing wireless towers, and Vertical Bridge appears to have paid nothing at all for CIGW's valuable "build to suit" assets.  Once again, any value for the holders of CIGW's Series B Preferred Stock and Common Stock were sacrificed to give Fir Tree its desired liquidity, on its timetable, and for the value that it wanted to pull out of CIGW.

78.    On March 19, 2015, the lame duck Special Committee dutifully recommended the final terms of the Merger to the Fir Tree-dominated Board, which immediately approved the Merger. Ironically, the Special Committee – purportedly tasked to evaluate the Merger on behalf of the minority stockholders – concluded that the transaction was in the minority's best interests, although it stripped their shares – once worth $80 to $100 million – of any meaningful value.

79.    Because a majority of the Director Defendants were interested in the Merger, beholden to Fir Tree, or subject to Fir Tree's domination and control, the Merger was not approved by a majority of disinterested and independent directors.

80.    On March 20, 2015, the terms of the Merger Agreement and related agreements were finalized and executed.

81.    Also on March 20, 2015, Fir Tree delivered the over 62% vote that it controlled at the time (including the votes of Defendants McGinn, Barber and Margent) to approve the Merger.  The terms of the Merger did not require that CIGW obtain approval of the transaction from a majority of its minority stockholders, or indeed that it solicit votes on the Merger from its minority stockholders at all, and it did not bother to do so.  Instead, the minority stockholders saw only a public press release and, a few days later, the information statement, informing them that the Merger had *already* been signed and approved, rendering their equity interests in CIGW, for all practical purposes, worthless.  On the day following the announcement, the already massively depressed CIGW share price plunged by 75%, from 19 cents per share to just five cents per share, and within a few more days, it was worth only two cents per share, where it stayed until the eventual close of the Merger.

82.    Even after announcement of the Merger, the value of McGinn's restricted shares were material to him personally, notwithstanding the impact of the Merger announcement on CIGW's common stock price.  Indeed, McGinn's restricted shares were still worth more than half his entire annual salary at approximately $160,000.  Nonetheless, to ensure McGinn's continued allegiance, the Fir Tree-dominated Board developed a plan to compensate McGinn with new, guaranteed cash payments of over $2 million in additional bonus and incentive payments, on top of his regular compensation of $450,000 per year.

83.    Specifically, McGinn would receive over $800,000 upon completion of the Merger (or any other transaction that brought Fir Tree its much-desired liquidity), and $1.2 million in additional retention bonuses, provided McGinn remained a loyal employee.  By this maneuver, Fir Tree not only ensured McGinn's continued dependence on, and lack of independence from, Fir Tree.  In the process, Fir Tree also took away from CIGW's minority stockholders more cash than the entire amount that was made available to them *as a group* as a result of the Merger.  In other words, McGinn would personally receive more than all of the money made available to CIGW's original investors combined.  McGinn and the rest of the Fir Tree-dominated Board approved these stunning rewards on March 20, 2015, the same day that they voted to approve the Merger.

84.    On the morning of May 6, 2016, CIGW filed a report with the SEC on Form 8-K, announcing that the terms of the Merger Agreement had been amended, and that the total consideration to be paid by Vertical Bridge in the Merger had been increased by $6 million, from $143 to $149 million dollars.  According to CIGW's Form 8-K, the total consideration payable in respect of CIGW's stock was reported to have increased by an even greater amount, $20 million, from $127.5 million to $147.5 million, subject to certain adjustments.  However, of that $20 million increase, only $500,000 is reported to have been allocated to the Series B Preferred stock and the common stock, while 97.5% of that amount, or approximately $19.5 million, would go entirely to Fir Tree.  At the same time, Defendant McGinn's retention bonus was increased by $400,000, so that McGinn personally would still take home more cash—$2.4 million in all—than all of the money made available to CIGW's other minority stockholders combined.

85.    On May 15, 2015, the Merger with Vertical Bridge was consummated and became effective.  As the culmination of the Defendants' persistent, ongoing course of wrongful conduct in breach of the fiduciary duties they owed to the Plaintiffs, the Defendants' negotiation and approval of the self-serving Merger was itself invalid and fraudulent with respect to the Plaintiffs.  In summary, Margent and Barber were culpably passive from the outset, and subsequently engaged in self-dealing that destroyed any trace of disinterest or independence that

they might otherwise have had from Fir Tree.  Meanwhile, McGinn and Fir Tree—including Cohen and Troeller, as Fir Tree principals—were subject to disabling conflicts of interest and worked together to effect the Merger, as well as its toxic antecedent course of conduct.   With Margent and Barber co-opted, Fir Tree and McGinn ultimately succeeded in diverting all of the value of CIGW to themselves, at the expense of CIGW's outside minority stockholders, including Plaintiffs.  For that, all of the Defendants should be held accountable.

### First Claim for Relief

### Breach of the Fiduciary Duties of Loyalty and Good Faith;

### Intentional Director Misconduct

### (All Director Defendants)

86.    Plaintiffs incorporate and reallege each and every allegation contained in Paragraphs 1 to 85 of this Complaint, as though fully set forth herein.

87.    The Director Defendants owed fiduciary duties of care, loyalty and good faith to CIGW and all of its stockholders, including a duty not to favor any one group, class or series of stockholders over another in managing the business and affairs of the corporation, which they breached by the acts and conduct set forth above.

88.    The Director Defendants did not act with loyalty or in good faith in their management of the Company's business and affairs; instead, they engaged in self-dealing and, disabled by conflicts of interest and the domination and control of Fir Tree, as the Company's controlling stockholder, the Director Defendants gave priority to the interests of the Fir Tree and their own personal interests, to the direct detriment of CIGW's minority stockholders, including the Plaintiffs.

89.    Following the closing of the Fir Tree Financing, the Director Defendants abdicated their affirmative duty to manage the business and affairs of the corporation for the benefit of CIGW and all of its stockholders, and in so doing engaged in intentional misconduct as corporate directors.  Under the domination and control of Fir Tree, the Board consistently acted (or failed to act) so as to enable and effect Fir Tree's objective of eroding the value of CIGW's common stock in order to render Fir Tree the outright majority stockholder of CIGW

and shift the entire value of CIGW's equity to Fir Tree, leaving the minority stockholders with nothing. Fir Tree co-oped the Director Defendants, who readily complied, to enable the Fir Tree Financing to operate in the most toxic way possible for CIGW and its stockholders at large.

90. The Director Defendants further abdicated their duties, and thus engaged in intentional misconduct, by, *inter alia*, approving and/or accepting substantial restricted stock grants that would not vest unless and until the grant recipients found an acceptable liquidity event for controlling stockholder Fir Tree alone; by accepting substantial bonuses conditioned exclusively on the completion of a transaction that provided liquidity to Fir Tree; by accepting excessive compensation for service on a sham Special Committee; by failing to appoint a special Board committee before the Fir Tree-dominated Board had approved the basic terms of the Merger and agreed to negotiate exclusively with Vertical Bridge; by appointing conflicted directors to the Special Committee; by failing to authorize the Special Committee to solicit, consider, or negotiate any alternate proposals that might be available to CIGW; by circumventing the Special Committee and turning away potential competing bidders for CIGW until the preferred deal with Vertical Bridge, which rendered the CIGW minority stock worthless, had been finalized, executed and approved by controlling stockholder Fir Tree; and by approving and entering into a Merger Agreement that was not subject to approval by a majority of CIGW's minority stockholders or, indeed, subject to any stockholder vote other than Fir Tree's vote. As the culmination of the Director Defendants' ongoing course of wrongful conduct in breach of the fiduciary duties they owed to the Plaintiffs, the Director Defendants' negotiation and approval of the self-serving Merger was invalid and fraudulent with respect to the Plaintiffs.

91. Because a majority of the board was not disinterested and independent of Fir Tree, and the Director Defendants abdicated their affirmative duty to manage the business and affairs of CIGW for the benefit of all its stockholders (and not just controlling stockholder Fir Tree), the Director Defendants bear the heavy burden of proving the entire fairness of their conduct from the perspective of the Company's common stockholders, which they cannot do.

92.    Defendants' actions directly damaged Plaintiffs by destroying the value of their equity interests in CIGW and shifting the entire value of CIGW's equity to controlling stockholder Fir Tree, and Fir Tree alone.

### Second Claim for Relief

### Breach of the Fiduciary Duty of a Controlling Stockholder

### (Fir Tree)

93.    Plaintiffs incorporate and reallege each and every allegation contained in Paragraphs 1 to 92 of this Complaint, as though fully set forth herein.

94.    From the time the Fir Tree Financing was entered into in August 2013, Fir Tree exercised actual domination and control over the business and affairs of CIGW, manipulating CIGW's affairs and the implementation of the terms of the Fir Tree Financing to serve Fir Tree's interests, to the direct detriment of CIGW's common stockholders.  After Fir Tree became CIGW's outright majority stockholder in mid-December 2013, just four months after putting its first dollar into the Company, Fir Tree redoubled its efforts to compromise CIGW's Board and strip CIGW's common stock of any value whatsoever, culminating in the Fir Tree-engineered Merger that would double Fir Tree's return on its equity investment while stripping the minority stockholders of the value of their investments and any ongoing interest in CIGW.  As the culmination of Fir Tree's ongoing course of wrongful conduct in breach of the fiduciary duties that Fir Tree owed to the Plaintiffs, Fir Tree's negotiation and approval of the self-serving Merger was itself invalid and fraudulent with respect to the Plaintiffs.

95.    As CIGW's controlling stockholder, Fir Tree owed fiduciary duties to CIGW's minority stockholders, including Plaintiffs, which they repeatedly and consistently breached by abusing their control position to serve their own interests; coopting the Director Defendants in service of Fir Tree's objectives; and engaging in massive self-dealing to the direct detriment of Plaintiffs, as set forth herein.

96.    Fir Tree's actions constituted intentional wrongdoing and directly damaged Plaintiffs by destroying the value of their equity interests in CIGW and shifting the entire value of CIGW's equity to Fir Tree, as CIGW's controlling stockholder, and Fir Tree alone.

**Third Claim for Relief**

**Aiding and Abetting Breach of the Fiduciary Duty of a Controlling Stockholder**

**(All Director Defendants)**

97.     Plaintiffs incorporate and reallege each and every allegation contained in Paragraphs 1 to 96 of this Complaint, as though fully set forth herein.

98.     The Director Defendants knowingly assisted Fir Tree's breaches of fiduciary duty as CIGW's controlling stockholder.

99.     Specifically, the Director Defendants knowingly engaged in a series of acts, as set forth herein, which enabled Fir Tree to obtain a near-super-majority voting position in CIGW, to erode the value of CIGW's common stock and transfer CIGW's entire equity value to Fir Tree, and to engineer and approve a merger that would deliver a 200% return on equity to Fir Tree, but terminate the interests of CIGW's minority stockholders for no consideration.

100.     The Director Defendants' knowing assistance constituted intentional wrongdoing and directly damaged Plaintiffs by destroying the value of their equity interests in CIGW and shifting the entire value of CIGW's equity to Fir Tree, and Fir Tree alone.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand judgment against Defendants as follows:

1.     Awarding Plaintiffs their damages in an amount to proven at trial, together with punitive damages, as allowed by law;

2.     Awarding Plaintiffs pre-judgment and post-judgment interest and their reasonable attorneys' fees and costs, as allowed by law; and

3.     Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable.

/ / /

/ / /

/ / /

/ / /

- 27 -

1    Dated:  April 11, 2017

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

LAXAGUE LAW, INC.

By: _____
Joe Laxague, Esq.
Nevada Bar No. 7417
Jeffrey D. Pike, Esq..
Nevada Bar No. 13934
Laxague Law, Inc.
1 East Liberty, Suite 600
Reno, NV 89501
Tel: (775) 234-5221
Facsimile (775) 996-3283
Email: joe@laxaguelaw.com

Roger A. Lane, Esq.
(will comply with LR IA 11-2 within 45 days)
Massachusetts BBO No. 551368
Foley & Lardner, LLP
111 Huntington Avenue
Boston, MA 02199-7610
Telephone:  617.342.4000
Facsimile:  617.342.4001
Email: RLane@foley.com
*Attorneys for Plaintiffs*