UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| COMPARTMENT IT2, LP, a Georgia limited partnership, COMPARTMENT IT5, LP, a Georgia limited partnership, COMPARTMENT IT9, LP, a Georgia limited partnership, and MFAM MOBILFUNK ASSET MANAGEMENT GMBH, a German corporation,<br><br>Plaintiffs,<br>v.<br><br>FIR TREE, INC. d/b/a FIR TREE PARTNERS, PAUL MCGINN, GABRIEL MARGENT, GRANT BARBER, JARRET COHEN, and SCOTT TROELLER,<br><br>Defendants. | Case No. 2:17-cv-01035-MMD-VCF<br><br>ORDER |

**I. SUMMARY**

Before the Court are three motions: (1) Defendant Paul McGinn's Motion to Dismiss (ECF No. 9); (2) Defendants Jarret Cohen, Fir Tree, Inc. ("Fir Tree"), and Scott Troeller's Motion to Dismiss (ECF No. 12); and (3) Defendants Gabriel Margent and Grant Barber's Motion to Dismiss (ECF No. 16). Plaintiffs Compartments IT2, IT5, and IT9, LP ("IT Funds"), together with MFAM Mobilfunk Asset Management GmbH (collectively, "Plaintiffs") filed one consolidated response (ECF No. 42), and Defendants replied (ECF Nos. 49, 50, 53). The Court held a hearing on the motions on March 26, 2018. (ECF No. 56.) For the following reasons, the Court grants Defendants' motions to dismiss.

**II. BACKGROUND**

The following facts are taken from the Complaint unless otherwise indicated. CIG Wireless, Inc. ("CIG") was a corporation whose business consisted primarily of leasing

antenna space to wireless service providers on its network of communications towers. (ECF No. 1 at 6.) Defendant Fir Tree was CIG's controlling shareholder by virtue of the large quantity of preferred stock it held, preferred stock that entitled it to first cut of the proceeds from any liquidation of CIG. Plaintiffs were CIG's minority shareholders and held only common stock. Plaintiffs allege that Fir Tree engaged in a course of conduct that caused the value of the common stock to plummet while leaving the value of the preferred stock intact, ultimately forcing a merger that left Fir Tree flush with cash and Plaintiffs virtually empty-handed. Plaintiffs further allege that the directors of CIG—Cohen, Troeller, Margent, Barber, and McGinn ("Director Defendants")—functioned as Fir Tree's puppets, carrying out Fir Tree's aim of concentrating the equity value of CIG in the preferred stock.

### A. Financing Agreements

Plaintiffs IT Funds and Defendant Fir Tree both ended up as CIG shareholders, but only Fir Tree started out that way. The IT Funds began their relationship with CIG as creditors. (*Id.* at 7.) Eventually, the IT Funds' confidence in CIG grew, and the IT Funds agreed to convert certain loans they had made to CIG into shares of CIG common stock. (*Id.*) Although the IT Funds and CIG executed this financing agreement in 2012, the loans did not actually convert until 2014 and 2015. (*Id.*)

While the IT Funds were still creditors, CIG obtained financing from Defendant Fir Tree consisting of a $35 million infusion with the right to call additional financing of up to $25 million. (*Id.* at 8-9.) In exchange for the $35 million infusion, Fir Tree received the right to designate two board members, veto power over certain business decisions, and two kinds of preferred stock (Series A-1 Preferred Stock and Series A-2 Preferred Stock). (*Id.* at 9-11.) Once Fir Tree received the preferred stock (of which Series A-2 conferred voting rights), Fir Tree controlled about 48.8% of CIG's voting stock. (*Id.* at 9.)

The financing was governed by a contract ("Fir Tree Financing Agreement"). The Fir Tree Financing Agreement established that both kinds of preferred stock were entitled to liquidation premiums and anti-dilution protection. (*Id.*) The Fir Tree Financing Agreement also established priorities among CIG's equity holders in the event of

liquidation: Series A-1 Preferred Stock would receive payment first, and any surplus would flow to Series A-2 Preferred Stock then to Series B followed by common stock. (ECF No. 12 at 6.)

Plaintiffs do not dispute that they executed an "Acknowledgement and Consent" to the Fir Tree Financing Agreement. (*See* ECF No. 42 at 19; *see also* ECF No. 14 at 42-44.)

### B. Fir Tree Becomes Majority Shareholder

CIG called on additional financing from Fir Tree twice, for a total of $9 million. (ECF No. 1 at 11.) When the first call closed on December 18, 2013, Fir Tree received sufficient shares of preferred stock to make it the majority shareholder of CIG, and the value of the common stock dropped to about $1.50 per share. (*Id.* at 11-12.) When the second call closed on March 7, 2014, Fir Tree held approximately fifty-six percent of the outstanding voting stock of CIG. (*Id.* at 12.) The common stock's value then fell further, to $1.25 per share. (*Id.*) Plaintiffs allege that the share price of the common stock fell because the common stock was diluted and placed under Fir Tree's growing liquidation preference. (*Id.*)

### C. Loan Conversion

The IT Funds' interests converted into shares of common stock on December 31, 2014, and March 31, 2015. (*Id.* at 17.) These conversions triggered the anti-dilution protections of Fir Tree's preferred stock, but the corporate charter and certificate of designation did not authorize enough shares to carry out the anti-dilution protection. (*Id.*) The Director Defendants amended the charter and certificate of designation to authorize more shares, and Fir Tree received voting shares sufficient to obtain sixty percent voting power. (*Id.* at 17-18.)

### D. Alleged Mismanagement

CIG allegedly went into "sleep mode" after accepting Fir Tree's financing. (*Id.* at 11-12.) CIG acquired towers at a slower rate, issued fewer press releases than it had prior to the Fir Tree financing, and abandoned efforts to list CIG's common stock on a U.S.

3

national exchange. (*Id.* at 11, 13.) The value of CIG's common stock dropped significantly as a result of Fir Tree's alleged dilution and expanding liquidation preference. (*Id.* at 13.) The share price of the common stock dropped to $0.28 by December 31, 2014. (*Id.*)

CIG also established an incentive plan for its executives. (*Id.* at 14-15.) Under the incentive plan, the Compensation Committee approved grants of about seven million restricted shares to certain directors that would only vest if Fir Tree obtained liquidity for its investment. (*Id.* at 15; ECF No. 12 at 7.) The shares had the same voting rights as common stock, but Fir Tree held the voting authority by proxy. (ECF No. 1 at 16.) Defendant McGinn received most of the shares (5,561,866). (*Id.* at 15.) Defendants Barber and Margent each received 166,856 shares, and CIG's Chief Financial Officer and Treasurer (a non-party) received 556,187 shares. (*Id.*)

**E.     Merger**

CIG announced its entry into a merger agreement with Vertical Bridge on March 20, 2015, causing the value of the common stock to drop to $0.02 per share. (*Id.* at 13, 18.) Under the terms of the merger agreement, Fir Tree would receive $90 million in cash, and the entire pool of common stock and Series B shares would split $1.75 million in cash, but only if they agreed to release Fir Tree and the Director Defendants from liability. (*Id.*) Plaintiffs refused the cash. (ECF No. 16 at 12.)

After announcing the merger, CIG appointed a Special Committee. (ECF No. 1 at 19.) Defendants Barber and Margent were the only members, and they received $10,000 per month for serving on the committee. (*Id.* at 19-20.) The Special Committee approved the merger with Vertical Bridge on March 19, 2015. (*Id.* at 22.) The terms of the Merger Agreement and related agreements were finalized and executed on March 20, 2015, after Fir Tree, wielding sixty-two percent of the shareholder vote, approved the Merger. (*Id.*)

**III.     LEGAL STANDARD**

A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pled complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.

R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal citation omitted).

In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, a district court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 679. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* at 678. Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiff's complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged–but not shown–that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570.

A complaint must contain either direct or inferential allegations concerning "all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly*, 550 U.S. at 562 (*quoting Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989) (emphasis in original)).

**IV.    DISCUSSION**

Defendants assert the threshold argument that Plaintiffs have failed to comply with Rule 23.1 of the Federal Rules of Civil Procedure regarding shareholder derivative suits.

(ECF No. 9 at 15; ECF No. 12 at 10-11; ECF No. 16 at 15.) Plaintiffs counter that the requirements of Rule 23.1 do not apply because their claims are either purely direct or otherwise dual direct and derivative. (ECF No. 42 at 12-13.) The Court agrees with Defendants that Plaintiffs' allegations either do not give rise to plausible direct claims or any plausible direct claims fall within the terms of the Financing Agreement.

Rule 23.1 applies to shareholder derivative suits and provides that a shareholder must either demand action from the corporation's directors before filing suit or plead with particularity the reasons why such demand would have been futile. *Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014). The requirements of Rule 23.1 do not apply to direct claims. Whether a claim is direct or derivative in nature turns on the following questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Ace Am. Ins. Co. v. Hallier*, No. 2:14-cv-00703-APG-NJK, 2015 WL 1326499, at *2 (D. Nev. Mar. 25, 2015); *see also Parametric Sound Corp. v. Eighth Judicial Dist. Court in & for Cty. of Clark*, 401 P.3d 1100, 1108 (Nev. 2017). "The court must 'independently examine the nature of the wrong alleged and any potential relief to make its own determination' regarding the nature of the claims." *Halpert v. Zhang*, No. CV 12-1339-SLR-SRF, 2015 WL 1530819, at *2 (D. Del. Apr. 1, 2015), *report and recommendation adopted*, No. CV 12-1339-SLR, 2015 WL 1869755 (D. Del. Apr. 21, 2015) (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004)).[1]

///

///

---

[1] The Court looks to Delaware case law to forecast how the Nevada Supreme Court would resolve the issue where Nevada precedent is not on point. *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008) ("Where there is no Nevada precedent on point this Court must predict how the Nevada Supreme Court would decide the question. Because the Nevada Supreme Court frequently looks to the Delaware Supreme Court and the Delaware Courts of Chancery as persuasive authorities on questions of corporation law, this Court often looks to those sources to predict how the Nevada Supreme Court would decide the question.").

## A. Whether Plaintiffs' Claims Are Direct

Plaintiffs argue that their claims are direct based on their allegation that the value of their common stock decreased while "the overall value of [CIG] as a company remained [and] Fir Tree's interest increased." (ECF No. 42 at 13.) While this allegation might demonstrate direct harm if examined in isolation, the factual allegations that support this conclusion do not demonstrate direct harm. Throughout the Complaint, Plaintiffs attribute the loss in value of their common stock to four kinds of action taken by Defendants: putting CIG into sleep mode, awarding improper executive compensation packages to the Director Defendants, failing to take proper steps to approve the merger, and over-issuing preferred stock to Fir Tree. None of these actions give rise to direct claims as pleaded.

### 1. Sleep Mode

Plaintiffs' allegations that Defendants put CIG into sleep mode give rise to derivative claims because Defendants' conduct would have hurt the company itself. "[A] claim of direct injury 'must be independent of any alleged injury to the corporation.'" *Halpert*, 2015 WL 1530819, at *2 (quoting *Tooley*, 845 A.2d at 1039). While Plaintiffs allege that CIG did not suffer any injury—that its value "remained"—these allegations are contradicted by Plaintiffs' allegations that Defendants slowed CIG's tower acquisition and media engagement to a crawl. (ECF No. 1 at 11-13.) It seems implausible that this course of conduct would not harm the corporation itself despite Plaintiffs' insistence that CIG was not harmed. (ECF No. 1 at 13; ECF No. 42 at 12-13.) Thus, accepting Plaintiffs' allegations as true, Plaintiffs cannot state a plausible direct claim based on the contradictory and conclusory allegation that CIG's value was not impaired relative to what it would have been if CIG were aggressively acquiring towers and engaging with the media to promote the company.

### 2. Executive Compensation

Plaintiffs' allegations regarding improper executive compensation either give rise to derivative claims or are too attenuated from Plaintiffs' alleged direct harm to ground direct claims. Plaintiffs allege that Defendants breached their fiduciary duties by directing or

authorizing the award of certain executive compensation: cash bonuses and grants of restricted stock to Defendants McGinn, Barber, and Margent. (*See* ECF No. 1 at 25; ECF No. 42 at 38-45.)

Allegations regarding the cash bonuses amount to allegations of excessive executive compensation. Such allegations give rise to derivative claims because excessive compensation harms the corporation. *See Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) (finding that claims related to purportedly excessive executive compensation were derivative).

Plaintiffs' allegations regarding the restricted shares are too attenuated from Plaintiffs' alleged direct harm to ground direct claims. Plaintiffs allege that the grant of restricted shares had two effects: aligning McGinn, Barber, and Margent's interest with Fir Tree's and diluting Plaintiffs' voting power. (ECF No. 42 at 40, 43.) However, Plaintiffs do not explain how either of these caused the alleged shift in equity of Plaintiffs' common stock to the preferred stock to state a plausible direct claim. In addition, Defendants contend that the restricted stock actually aligned their interests with the common shareholders like Plaintiffs because the restricted shares—just like the common shares—were subordinate to the preferred shares in the event of liquidation. (*See, e.g.*, ECF No. 12 at 19.) Without additional factual allegations, the Court does not find it plausible that the award of restricted stock itself caused the value of Plaintiffs' common shares to shift to Fir Tree thereby harming only Plaintiffs as holders of the common stock.

### 3. **Merger and Pre-Merger Activities**

Plaintiffs allegations related to the merger are also too attenuated from Plaintiffs' alleged direct harm to ground direct claims. Plaintiffs allege that the CIG Special Committee was not properly formed and did not function properly, that the merger was not conditioned on a majority-of-the-minority vote, and that the interests of the controller and the minority diverged. (ECF No. 42 at 28.) However, Plaintiffs do not allege how these actions caused the value of Plaintiffs' common shares to shift to Fir Tree or caused harm
///

to Plaintiffs but not CIG. Thus, the Court cannot find that these allegations plausibly give rise to direct claims.

### 4. Issuance of Preferred Stock

Plaintiffs' allegation of direct harm stemming from the issuance of preferred stock to Fir Tree does not give rise to direct claims because Plaintiffs are estopped from asserting such claims by their consent to the Fir Tree Financing Agreement. Plaintiffs allege that the value of their shares dropped because Fir Tree caused CIG to issue more and more preferred stock. (*Id.* at 11-12.) Specifically, Plaintiffs allege that Fir Tree received CIG stock in exchange for capital infusions, in lieu of dividends, and in connection with its anti-dilution protections. (ECF No. 1 at 8-9, 17.) But these issuances were permitted by the Fir Tree Financing Agreement Plaintiffs ratified and cannot form the basis of Plaintiffs' claims. *See Carstarphen v. Milsner*, No. 3:07-cv-00542-ECR-RAM, 2011 WL 4916620, at *7 (D. Nev. Oct. 14, 2011) (finding that shareholder was estopped from challenging board actions to which he consented). Thus, to the extent Plaintiffs might demonstrate an independent harm giving rise to direct claims, they have not done so here because of the terms of the Financing Agreement.

### B.  Whether Plaintiffs' Claims Are Dual Direct and Derivative

Plaintiffs further argue that their allegations give rise to dual direct and derivative claims. (ECF No. 42 at 13.) While "the same set of facts may inflict both derivative and direct harm on a shareholder, generating both a direct claim and a derivative claim," this is an exception to the general rule that allegations of corporate mismanagement resulting in depressed share prices give rise to derivative actions. *See Halpert*, 2015 WL 1530819, at *2 (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988)). "A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the

///

controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders." *Gentile v. Rossette*, 906 A.2d 91, 99–100 (Del. 2006).

Plaintiffs' allegations do not give rise to dual direct and derivative claims because the allegations do not show that the shares Fir Tree received were excessive. Plaintiffs allege that Fir Tree received CIG stock in exchange for capital infusions, in lieu of dividends, and in connection with its anti-dilution protections. (ECF No. 1 at 8-9, 17.) But these issuances were permitted by the Fir Tree Financing Agreement Plaintiffs ratified. Plaintiffs argue that extra-contractual conduct led to excessive issuances, but the only plausibly extra-contractual conduct related to share issuance that Plaintiffs allege is the amendment of the corporate charter and certificate of designation to authorize more shares. (ECF No. 42 at 14.) While the Fir Tree Financing Agreement did not specifically contemplate charter amendment, amending the charter became necessary to honor the Fir Tree Financing Agreement. If the anti-dilution protection required the issuance of more stock than was authorized, then the charter or certificate of designation would need to be amended to issue more stock.

Because Plaintiffs' claims are neither direct nor dual direct and derivative, the Court will dismiss Plaintiffs' Complaint for failure to comply with Rule 23.1.

**V. CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Defendant Paul McGinn's Motion to Dismiss (ECF No. 9) is granted.

It is further ordered that Defendants Jarret Cohen, Fir Tree, and Scott Troeller's Motion to Dismiss (ECF No. 12) is granted.

It is further ordered that Defendants Gabriel Margent and Grant Barber's Motion to Dismiss (ECF No. 16) is granted.

It is further ordered that Plaintiffs' Complaint (ECF No. 1) is dismissed without prejudice.

The Clerk is directed to enter judgment in accordance with this Order and close this case.

DATED THIS 30th day of March 2018.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE